**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM WENGERT,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **PHOEBE MINISTRIES,** | : | **No. 12-37** |
| **Defendant.** | : | |

**MEMORANDUM**

**Schiller, J.**                                                          **October 19, 2012**

   William Wengert was fired from his job as a certified nursing assistant at Wyncote Church Home ("Wyncote," incorrectly designated as Phoebe Ministries) following an incident at Wyncote in which a resident suffered a broken fibula. Wengert believes that the actual reason for his termination was his HIV-positive status. Presently before the Court is Wyncote's motion for summary judgment. For the reasons that follow, the Court grants the motion.

**I.      BACKGROUND**

  **A.      July 15, 2011 Incident and Its Aftermath**

   Wengert worked at Wyncote as a certified nursing assistant from April 1993, until July 19, 2011. (Def.'s Statement of Undisputed Facts [Def.'s SOF] ¶ 1.) According to Wyncote, Wengert's termination was the result of an incident that occurred on July 15, 2011. On that date, Wengert was working a shift from 2:15 p.m. to 8:15 p.m. (*Id.* ¶ 2.) Around 8:00 p.m., another certified nursing assistant, Patricia Washington, asked Wengert to help her to shower a resident named Josephine Pinegar. (*Id.* ¶ 3.) Wengert knew that Pinegar had a history of falls, and he had helped lift her numerous times. (*Id.*)

Wengert and Wyncote offer somewhat different accounts of what occurred next. According to Wengert, after Washington sought his assistance, he went to the nurse's station to check Pinegar's care card because he was unfamiliar with Pinegar's needs. (Def.'s Mot. for Summ. J. Ex. 2 [Wengert Dep.] at 12.) He could not find a care card for Pinegar and upon returning to Pinegar's room, he was told by Washington not to worry about it because she knew how to care for Pinegar. (*Id*. at 12-13.) Washington and Wengert placed Pinegar on a sit-to-stand lift from her wheelchair, placed straps under Pinegar's armpits, and hooked those straps to the lift. (*Id*. at 13, 15-17.) The straps were not on tightly because Pinegar did not like the sit-to-stand lift. (*Id*. at 19.) Pinegar grabbed onto the lift and as she "got in the standing position," she moved her bowels. (*Id*. at 17.) Pinegar "went into . . . . dramatics, like she got really embarrassed and slid and let go and she just let her body go." (*Id*.) As Pinegar began to fall, Washington and Wengert quickly grabbed her and lowered her to the floor for a brief period of time. (*Id*. at 13-14, 18.) Wengert went to look for a mechanical device to lift Pinegar from the ground, but he could not locate one on the floor. (*Id*. at 24, 26.) Wengert then informed Pam Moore, a nurse nearby, of what had just occurred. (*Id*. at 14, 27) Moore did not want to get involved in the situation and directed Wengert to find somebody else. (*Id*. at 27-28.) He returned to the shower room. (*Id*. at 28.) Wengert and Washington then placed a sheet under Pinegar, used the sheet to lift her into a wheelchair, and Washington brought her back to her room. (*Id*. at 14, 25, 28-29.) Wengert did not consider Pinegar's collapse to be a fall. (*Id*. at 30.) Washington agreed that the incident would not necessarily be considered a fall under Wyncote's policies. (Def.'s Mot. for Summ. J. Ex. 3 [Washington Dep.] at 17-18.) As a result of the events on July 15, 2011, Pinegar suffered a broken left fibula. (Def.'s SOF ¶ 10.)

An investigation into the incident commenced. Wyncote's version of the events is based on

the results of that investigation. The investigation report states that it was completed by a supervising nurse, Lindsey Alessandro.[1] (Wengert Dep. Ex. 1 [Investigation Report]; Pl.'s Resp. to Def.'s Mot. for Summ. J. [Pl.'s Resp.] Ex. G [Bannon Dep.] at 16.) Alessandro testified that she and Susan Schlener, Wyncote's Director of Nursing, performed the investigation and that they interviewed Pinegar, Moore, and a nurse named Kodjo Agbadan, as well as took statements from Wengert and Washington. (Bannon Dep. at 23-24.)

Washington and Wengert provided written statements about the incident. Wengert testified that she was immediately lowered from the lift to the ground, whereas Washington reported that Pinegar was in her wheelchair after falling from the lift. Specifically, according to Washington's statement, "while placing [Pinegar] onto the stand lift she started slipping thru the straps of the lift. So we removed her sat her back down into the wheelchair. We brought the shower chair closer and tried to pivot her back onto the shower chair." (Def.'s Mot. for Summ. J. Ex. 1 [Schlener Aff.] Ex. A [Washington Statement].) At that point, Pinegar lost control of her bowels, and Wengert and Washington had to lower her onto the floor. (*Id*.) Wengert got a sheet and they moved Pinegar back into her wheelchair, and told a nurse what had transpired. (*Id*.) Pinegar began complaining to Washington about ankle pain, and a nurse came in asking questions and had Washington take Pinegar's vital signs. (*Id*.)

Pinegar provided a statement about the incident to Moore on July 15, 2011. She stated that Wengert and Washington wanted her to sit down in a shower chair. (Wengert Dep. Ex. P1-16

---

[1] Though it is not clear from the record, the Court believes that Alessandro is the maiden name of Lindsey Bannon, who was deposed in this case and participated in the investigation of the July 15, 2011 incident. (*See* Def.'s Reply Br. at 3.) The Court will refer to both names depending on the context.

[Moore Statement].) They stood behind her and when Pinegar tried to stand, her knees buckled and "then [she] was on [her] knees in front of the bathing chair." (*Id*.) Pinegar tried to turn herself around so she could sit in the chair. (*Id*.) She instructed Wengert to lay her down on the floor, and Wengert told her that she was already on the floor. (*Id*.) Wengert and Washington then pulled her up by her arms and placed her in the wheelchair. (*Id*.) She was then wheeled to her room, where she told Washington that her ankle hurt. (*Id*.)

Schlener also conducted an interview with Pinegar. Pinegar stated that Wengert and Washington did not use a mechanical lift to transfer her to the shower chair and that they failed to call a nurse, though one eventually entered Pinegar's room after she was wheeled back, but "[n]ot for a long time." (Wengert Dep. Ex P1-17 [Pinegar Interview].)

Based on the evidence obtained, Alessandro and Schlener "felt that this incident was substantiated, policies and procedures were not followed, and it actually resulted in an injury of the resident." (Bannon Dep. at 25.) On July 19, 2011, Schlener fired both Wengert and Washington. (Def.'s SOF ¶ 16.) Wengert testified that during the phone call with Schlener and others in which he was fired, the incident with Pinegar was referred to as an "abuse situation" that involved "neglect or abuse." (Wengert Dep. at 36-37.)

### B. Wengert's HIV status

Around January 24, 2011, Wengert was bitten on the shoulder by a patient. (*See id*. at 71-73.) Karen Rozak, Defendant's occupation nurse, informed Wengert that as a result of the incident, he would need to have blood drawn to test for HIV. (*Id*. at 72.) Wengert then said to Rozak, "nobody was aware of this, but I am HIV positive, so you're going to find out that I have it." (*Id*.) Rozak told Wengert that Marian Oglesby, Wyncote's director of nursing prior to Schlener, had informed her that

4

Wengert was possibly HIV-positive. (*Id*. at 72-73; *see also* Pl.'s Resp. Ex. D [Def.'s Resps. to Pl.'s First Set of Admis.] at 3.)

Wengert believed that a number of his co-workers were aware of his HIV-positive status. According to Wengert, he would from time to time arrive at work with notes from the Jonathan Lax Treatment Center, which treats patients with HIV. (Wengert Dep. at 74-75.) Wengert suggested that employees at Wyncote could have learned of his HIV-positive status based on these notes. (*Id*.) He also contended that Alessandro's behavior toward Wengert changed after the biting incident, thereby suggesting that she knew that he was HIV-positive. (*Id*. at 80.) Based on an incident when Moore disciplined Wengert for failing to use gloves when he took a resident to the bathroom, Wengert also testified that Moore was aware of his HIV-positive status. (*Id*. at 84-86.) However, nobody directly said anything to Wengert about his HIV status. (*Id*. at 76, 110, 112-14.)

Furthermore, Schlener had only arrived at Wyncote shortly before she fired Wengert and Wengert did not know who she was prior to the incident with Pinegar. (*Id*. at 96-97; Schlener Aff. ¶ 7.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 32 F.3d 768, 777 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    DISCUSSION

The Americans with Disabilities Act ("ADA") bars discrimination against a qualified individual "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Courts use the familiar three-part burden-shifting test to evaluate claims under the ADA. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000); *Socoloski v. Sears Holding Corp.*, Civ. A. No. 11-3508, 2012 WL 3155523, at *2 (E.D. Pa. Aug. 3, 2012). First, a plaintiff must set forth a prima facie case for discrimination, which requires the plaintiff to establish that he: (1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation by his employer; and (3) has suffered an adverse employment decision as a result of discrimination. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). If the plaintiff sustains his burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment action. *Shaner*, 204 F.3d at 500. If the employer

articulates such a reason, the burden returns to the plaintiff to show that the employer's proffered reason is pretextual. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). To establish pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

### A.    Knowledge of Wengert's Disability

For purposes of this motion, Wyncote concedes, and the Court will operate under the presumption that, Plaintiff's HIV-positive status qualifies as a disability under the ADA. (Def.'s Mem. in Support of Mot. for Summ. J. [Def.'s Mem.] at 5.) But that concession does not mean that Wengert has stated a prima facie case for discrimination. "[T]o establish discrimination because of a disability, an employer must know of the disability." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002); *see also Jones v. United Parcel Serv.*, 214 F.3d 402, 406 (3d Cir. 2000) ("It is, of course, an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability.").

The requirement that a plaintiff have a disability under the ADA includes the requirement that the plaintiff show that the employer knew of that disability. Thus, Wengert's prima facie case must include evidence that creates a genuine issue of fact as to whether Wyncote knew Wengert was HIV-positive. *See Straining v. AT&T Wireless*, 144 F. App'x 229, 232 (3d Cir. 2005) (noting that in the Third Circuit, the requirement that plaintiff show he is disabled implies a requirement that the plaintiff show employer knew of employee's disability); *see also Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("The employer's knowledge, in this class of cases, is a critical

7

element of the plaintiff's prima facie case. . . . [D]isabilities are often unknown to the employer, and, because of that, the plaintiff must demonstrate that the defendant employer knew of the disability to state a prima facie case of unlawful discharge.").

Plaintiff presents no evidence that anybody other than Schlener made the decision to fire Wengert. Indeed, Wengert produced no evidence that any individual responsible for his termination knew, or even perceived, that he was disabled. He thus cannot make out a discrimination claim. It is undisputed that Schlener concluded that Wengert and Washington had violated Wyncote policy, that the misconduct "constituted resident neglect" and that she "discharged both Wengert and Washington on July 19, 2011." (Schlener Aff. ¶ 6; *see also* Def.'s Reply Br. Ex. 1 [Schlener Supplemental Aff.] ¶ 4 ("I made the decision to discharge Wengert and Washington . . . Based upon my conclusion that both employees were guilty of resident neglect, I felt that discharge of both employees was appropriate.").) Her decision was based upon her review of the record compiled during the investigation. (Schlener Aff. ¶ 6.) It is true that others participated in the investigation. Moore took a statement from Pinegar. Bannon also participated in the investigation by interviewing people and evaluating the evidence. The evidence in the record shows that prior to July 15, 2011, Schlener, Moore, and Bannon were unaware that Wengert was HIV-positive. (Def.'s Resps. to Pl.'s First Set of Admis. at 3.) The individuals who knew about Wengert's HIV-positive status, Rozak and Oglesby, played no role in the decision to terminate Wengert. This Court will not impute the knowledge of those aware of Wengert's status to those who were responsible for the adverse employment action. *See Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 954 (3d Cir. 1996); *see also Straining*, 144 F. App'x at 232 (concluding that knowledge of a disability by employee cannot be imputed to another who is making the employment decision). Wengert produced no evidence that

any individual responsible for his termination knew, or even perceived, that he was disabled. He thus cannot make out a discrimination claim.

Wengert recounted an incident in which he overheard Alessandro tell Moore that he should not be working at Wyncote "due to the fact that [he is] gay and [he] could have – you know, and HIV stuff." (Wengert Dep. at 110.) When pressed, however, Wengert conceded that he did not hear Alessandro say anything about Wengert's HIV-positive status during this conversation. (*Id.* at 112-14.) Additionally, this is not evidence that any decision maker knew of Wengert's HIV-positive status. For one, Wengert was not part of the conversation; he merely overheard two people talking. Second, he admitted that his HIV-positive status, which is the basis for his discrimination lawsuit, was not mentioned. Third, assuming Wengert's co-workers did make inappropriate comments about his sexual orientation, the thoughts and opinions of co-workers with no power to make employment decisions on behalf of Wyncote are irrelevant. Wengert still has no evidence to confront the evidence that the decision to terminate was made by an individual unaware of his HIV-positive status and thus the decision to fire Wengert could not have been the result of discrimination based on his HIV-positive status. Finally, if derogatory comments about Wengert's sexual orientation were made, that is inappropriate and unprofessional behavior. In 2012, it should go without saying that one's sexual orientation is not synonymous with his or her HIV status. The Court cannot make the numerous inferential jumps that because some of Wengert's co-workers knew he was gay, they knew he had HIV and that the person who decided to fire him did so because he was HIV-positive, even though there is no evidence that she knew of either his HIV-positive or his sexual orientation.

**B.     Pretext**

Wyncote is also entitled to summary judgment because Wengert cannot point to any evidence

that suggests the reason provided for his termination was pretextual.

Wengert disputes Wyncote's contention that Pinegar was required to be moved by mechanical lift and he further contends that even if a mechanical lift were required, Wengert was unaware of that requirement with respect to Pinegar. (Pl.'s Resp. at 5-6.) Wengert also claims that Pinegar did not technically suffer a fall on the date in question, and that Wyncote "does not have a written policy outlining what to do when a resident is *intentionally* lowered to the ground." (*Id*. at 6.)

Plaintiff's semantics on what defines a "fall" is unpersuasive. It is undisputed that as a result the incident involving Pinegar, she suffered a broken fibula. Wyncote investigated the situation and determined that based on the statement of those interviewed, the credible evidence demonstrated that Washington and Wengert violated Wyncote policy in their care for the resident. This conclusion is supported by the record. Furthermore, absent evidence of discrimination, it is not the job of this Court to second-guess the employer's decision. Thus, even if a neutral arbiter determined that the incident unfolded exactly as Wengert described and that he did not violate policy on the date in question, he would not make out a discrimination case. At most, he would have demonstrated that Wyncote's decision was incorrect. To discredit the employer's articulated reasons, however, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence. . . .'" *Id*. (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). The plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so

10

plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Cred. Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). Wengert has made no such showing.

Furthermore, Wengert cannot defeat summary judgment by suggesting that he was unaware of Pinegar's specific medical needs. The Court will grant that Wengert was a valued and dedicated employee of Wyncote for a long period of time. But it is undisputed that Wengert was a central player in an incident that led to the broken fibula of a resident of the nursing home. Wengert might not agree with the outcome of Wyncote's investigation, but Wyncote indisputably had a duty to investigate the situation and act upon those findings. Though Wengert might consider the outcome harsh or unfair, that does not sustain a discrimination claim. Wyncote may make decisions that its employees (and even this Court) may consider wrong, misguided, or unjust. But provided those decisions do not run afoul of the law, the Court will not revisit them.

Finally, the Court notes that Wyncote fired both certified nursing assistants involved in the incident that caused Pinegar's fracture. Washington admitted that they should have had a nurse make a proper assessment prior to lifting Pinegar with a sheet. (Washington Dep. at 26.) Wyncote's decision to terminate both individuals, particularly after one individual credibly admitted that proper procedures were not followed, supports Wyncote's contention that Wengert's termination was not pretext for discrimination.

## IV.   CONCLUSION

Wengert has failed to make out a prima facie case for discrimination as well as failed to produce evidence of pretext on the part of Wyncote. Either failure is sufficient to grant summary judgment in Wyncote's favor. An Order consistent with this Memorandum will be docketed

11

separately.